IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

YVONNE MARIE PRAUSE,

                Plaintiff,

v.

ANDREW M. SAUL, Commissioner of
Social Security,

                Defendant.

OPINION AND ORDER

18-cv-780-wmc

---

Pursuant to 42 U.S.C. § 405(g), plaintiff Yvonne Marie Prause seeks judicial review of a final determination that she was not disabled within the meaning of the Social Security Act. Prause contends that remand is warranted because the administrative law judge ("ALJ") erred (1) by failing to account for her mental impairments and handling/fingering limitations in formulating her RFC; and (2) in assessing her credibility. The court held a telephonic hearing on plaintiff's appeal on February 6, 2020. While a close call, this matter will be remanded for further proceedings in light of the parties' briefs, discussion at oral argument and the record in the case as a whole.

BACKGROUND[1]

**A. Overview of Claim**

Plaintiff Yvonne Prause applied for social security disability benefits and supplemental income on July 30, 2014, claiming an alleged onset date of October 1, 2012. At the hearing with the ALJ, Prause amended the alleged onset date to October 21, 2012,

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #7.

to coincide with her 50th birthday. Prause was last insured on December 31, 2016. With a birth date of October 21, 1962, Prause was an "individual closely approaching advanced age" on the date last insured. Prause has past relevant work as an office manager. She claimed disability based on neck degenerative disease, neck surgeries, rheumatoid arthritis, and feet/hands/hip pain. (AR 225.)

B. ALJ's Decision

ALJ Kathleen Kadlec held a video hearing on February 24, 2017, at which Prause appeared personally and by counsel. As of the alleged onset date, the ALJ found that Prause suffered from the following severe impairment: "osteoarthritis/ rheumatoid arthritis; degenerative disc disease of the cervical spine; a right rotator cuff tear; and anxiety." (AR 12.)[2]

The ALJ considered whether mental impairments met or medically equaled the criteria for listing 12.06 in 20 CFR Part 404, Subpart P, Appendix 1. Specifically, in evaluating the four broad areas of mental functioning "criteria" in paragraph B, the ALJ concluded that Prause had: no limitation in understanding, remembering or applying information; no limitation in adapting or managing oneself; a mild limitation in concentrating, persisting or maintaining pace ("CPP"); and a moderate limitation in interacting with others. (AR 13-14.) In light of these findings, the ALJ concluded that the Paragraph B criteria were not satisfied. The ALJ also concluded that the Paragraph C

---

[2] The ALJ also noted that Prause claimed other impairments, namely hypertension, a right foot fracture and asthma, but found those conditions non-severe. Plaintiff does not challenge these findings on appeal.

2

criteria were not met.

Based on these and other findings not relevant to this appeal, the ALJ concluded that Prause had the residual functional capacity ("RFC") to perform light work, although specifically limited her to: (1) *frequently* operating hand controls bilaterally, reaching in all directions bilaterally, handling, fingering and feeling bilaterally, or responding to supervisors and co-workers; and (2) *occasionally* responding to the public and reaching overhead bilaterally. (AR 14-15.)

In formulating this RFC, the ALJ expressly considered Prause's testimony about the extent of her limitations, and specifically her claims that she could not cook or clean, frequently dropped things because of significant symptoms with her hands, could not sit or stand for long periods due to pain in her back, and suffered from anxiety and panic attacks. The ALJ also summarized Prause's medical record, specifically with respect to her rheumatoid arthritis and degenerative disc disease, while discounting Prause's allegations of additional limitations. In particular, the ALJ found no support in the objective medical evidence for these limitations, pointing out that: there were "minimal clinical findings on examination regarding her hands"; her "rheumatoid arthritis has been routinely stable on medication"; and while the records reflected prior neck surgeries, her "symptoms were noted as controlled with the medications," and that she had yet to schedule another surgery. The ALJ also found inconsistencies in the record, including that: she testified at the hearing to being unable to afford physical therapy, but was attending it as the time of the hearing; and she indicated on a form that she was able to perform all her activities with mild difficulty, as well as testified that she had balance problems that resulted in her falling

and hurting her foot, but the records reflect that she was walking and struck the doorframe with her foot. (AR 19-20.) Finally, the ALJ found "no medical opinion in the file opining that the claimant is unable to work or that provides limitations that would conclude such." (AR 20.) The ALJ also relied in part on the state agency medical consultants' findings that Prause could engage in the full range of light work, although only placing some weight on these opinions because of additional evidence received at the hearing that supported the additional limitations the ALJ provided in the RFC. (AR 20.)

With the assistance of the vocational expert's testimony, the ALJ concluded that Prause could perform her past work as an office manager, which was a sedentary exertional level job. In the alternative, the ALJ concluded that there were other jobs Prause could perform, namely cleaner / housekeeping, office helper and garment sorter. As such, the ALJ concluded that Prause was not disabled.

### C. Medical Record

#### 1. Rheumatoid Arthritis and Cervical Spine Issues

On March 4, 2013, Prause saw Dr. Water J. Marbach, M.D., for a six-month follow-up appointment. Dr. Marbach noted that she has "remained well" with "no interim flares" and "no new concerns." (AR 452.) On examination, Dr. Marbach also noted that her "[p]eripheral joint exam remains unremarkable," with no signs of "early RA hand issues," only noting minimal swelling. (*Id.*) He then renewed prescriptions for HCQ (her rheumatoid arthritis medication) and for hydrocodone, directing her to return in four months.

On February 10, 2014, Prause saw Dr. Andrew S. Zelby of Neurological Surgery &

4

Spine Surgery, S.C., for an initial consultation about her low back pain, which she stated had developed two years before and may have been caused by a fall at work right before she was terminated. (AR 326.) She also complained of tingling in her right arm, numbness in her left thigh and weakness in her right hand, while denying any pain in her neck, arms and legs. Noting her prior cervical surgeries in 2002 and 2005, Dr. Zelby found upon his own examination "well-healed anterior and posterior cervical scars" and "mild tenderness to deep palpation in the cervical spine." (AR 320.) He also noted that her range of motion varied, but her walking, gait and strength in upper and lower extremities were all normal. Dr. Zelby ordered MRIs and directed her to return after completion of those studies.

On March 10, 2014, Prause had a follow-up consultation with Dr. Zelby. (AR 320.) At this appointment, she complained of neck pain that radiated to her right shoulder and intermittently down her right arm. Dr. Zelby also reviewed MRI results from February 28, 2014, which showed her prior cervical fusions, and noted "degenerative disc disease at C4-5 and C7-T1, with partial loss of disc space height at both levels." (AR 321.) The MRI further revealed "at C7-T1, there is a broad-based posterior vertebral osteophyte with complete effacement of the CSF and mass effect on the spinal cord." (*Id.*) As for the MRI of the lumbar spine, Dr. Zelby noted: "degenerative disc disease at L2-3 with partial loss of disc space height and mild degenerative endplate changes. At L2-3 and L4-5, there are broad-based bulging disc and mild bilateral lateral recess stenosis." (*Id.*)

Considering these results, Dr. Zelby explained to Prause that the cervical spine showed "spinal cord compression at C7-T1," as well as ordered x-rays to better assess the status of her previous fusion. (AR 322.) As for the lumbar MRI, Zelby explained that the

5

changes were "appropriate for her age," that the "degeneration . . . is relatively mild," and that surgery is not required. (*Id.*)

On March 31, Prause returned to Dr. Zelby, reporting that the pain had increased from her last appointment on March 10, but also noting that she was only taking ibuprofen because she had missed her appointment with her pain physician for a medication refill. (AR 323.) Dr. Zelby reviewed the cervical spine x-rays indicated the prior fusion was in a "good position" and there was "no movement at C6-7 between flexion and extension." (AR 324.) Based on these results and the earlier MRI, Dr. Zelby recommended a fusion at C7-T1, but told her that he wanted to wait until she stopped smoking for six months to improve healing. (AR 324.) There are no records suggesting that Prause followed-up with Dr. Zelby again.

A year later, in April 2014, Prause returned for an appointment with her regular treating physician, Dr. Donald Higgins. Dr. Higgins noted that that her "RA has remained quiet on HCQ." (AR 415.) Higgins described Prause's cervical pain and noted her upcoming appointment with a surgeon about a possible third cervical surgery. He also prescribed medication and directed her to return in four months.

Prause saw Dr. Higgins again in September 2014 for a follow-up appointment. Dr. Higgins again reported that her "RA remains quiet on HCQ (Plaquenil)." (AR 400.) Higgins noted that her main concerns were cervical spine pain and, upon examination, that her "[n]eck motion borders on seriously reduced," with "[c]hin-chest distance . . . a full 2 inches." (*Id.*) Still, Higgins noted that her "[h]and exam remains nearly normal, minimal PIP swelling," prompting him to renew her prescriptions for hydrocodone, HCQ and low-

6

dose Lorazepam, and directing her to return in six months. (*Id.*)

On March 7, 2015, Prause returned for a six-month check-up with Higgins' colleague, Dr. Marbach. Prause reported that she was pleased with Lorazepam. Dr. Marbach also noted that: Prause "did see her neck surgeon and additional surgery was suggested. Plans to have it eventually, but not anytime soon. Says her symptoms (RUE radicular pain) are stable and without a motor component, so able to wait." (AR 496.) Finally, with respect to her rheumatoid arthritis, Prause reported that it "had been more active in recent weeks," but has not "badly flared." (*Id.*) Still, she requested a steroid burst to help with the flare-ups. On exam, Dr. Marbach noted that her "neck motion remains moderately reduced," and also noted that her "joint exam remains nearly normal, only minimal hand signs, mostly slight PIP swelling." (*Id.*) He refilled prescriptions and directed her to return in six months.

Prause returned to see Dr. Higgins on July 8, 2015, complaining of neck pain, back pain and shoulder pain. (AR 510.) The neck and back pain description are the same as the September 2014 description. The shoulder pain began two weeks before, caused by excessive use after cleaning out a flooded basement. The physical exam revealed some tenderness and weakness in her right shoulder, but otherwise strength, muscle tone and range of motion were normal.

In February 2016, Prause sought treatment from Larisa Piton, APN, with Loyola Medicine, complaining of low back pain and shoulder pain. (AR 620.) The plan was to obtain x-rays and attempt physical therapy. The physical examination revealed lumbar pain, but only mild pain in her cervical spine and no pain in her shoulders. (AR 623.) In

7

April 2016, Prause saw Dr. David M. Sliwoski, M.D. also with Loyola Medicine. During this appointment she complained of neck, right shoulder and low back pain. (AR 634.) Dr. Sliwoski reported that she had been doing physical therapy and were waiting for a electromyography test. The results of the physical examination were the same as that in February. Dr. Sliwoski also reviewed the results of the cervical imaging from February 2014, which revealed that her prior fusions were solid, but that she had "[m]oderate to severe facet/uncovertebral osteoarthritis of her cervical spine" and "[l]ow-grade dynamic instability C4 on C5." (AR 638.) Sliwoski also reviewed the results of a March 7, 2016, cervical spine MRI, which showed "[u]ncovertebral joint arthropathy C5-T1, muldilevel mod BL foraminal stenosis." (AR 638-39.) Prause also had an MRI of her right shoulder in March 2016, which revealed "[l]abral and RTC tears, AC Joint arthritis." (AR 639.) This appears to be her last appointment with Loyola Medicine.

Around June 2016, Prause moved to Wisconsin, establishing care at the Wisconsin Rapids Center, Marshfield Clinic in October 2016. (AR 584.) She reported that she had run out of her prescriptions two months prior. She was referred to a new rheumatologist, Dr. Rahul Dehgal, who she saw on November 2, 2016, and was prescribed HCQ and a muscle relaxant. (AR 593.)

On January 19, 2017, she was seen by Andrea T. Peterson, D.O., also of the Wisconsin Rapids Marshfield Clinic, for neck pain, radiating down her right arm. (AR 647.) Dr. Peterson reviewed her February and March 2016 x-rays and MRIs, started Prause on gabapentin and methocarbamol for pain and referred her to physical therapy and for an epidural injection. Dr. Peterson also informed Prause that she did not see a

8

concern with respect to the rotator cuff tear, instead suspecting that her pain stemmed from her cervical spine issues. A February 17, 2017, note reflects a medication refill request for gabapentin, indicating that Prause reported she was "very pleased with the results." (AR 662.)

2. **Mental Health**

With respect to her mental health, Prause was referred to Dr. Sujatha Wolff for a psychiatric consultation in June 2012. While this predates her alleged onset disability date, Wolff diagnosed her with an anxiety disorder and recommended outpatient counseling and medication, specifically Lexapro. (AR 480.) As described above, it appears that she was then prescribed anti-anxiety medication by her treating physicians.

On May 5, 2015, Prause also saw Roberta F. Stahnke, Psy.D., for a mental status assessment. (AR 502.) Prause reported that she had experienced anxiety for the last six years, including excessive fear and worry thoughts. She indicated that her anxiety impacted her sleep, but denied ever experiencing a panic attack, suicidal or homicidal ideations, or any other symptoms of emotional distress or psychiatric illness. She also reported attending some grief counseling after the death of her husband and taking a low dose of Lorazepam for the last five years. As for the mental status examination, Dr. Stahnke reported that her "thought process was well organized and goal oriented" and "[c]omprehension was intact." (AR 503.) Prause was also able to complete various memory and concentration tests. Dr. Stahnke diagnosed her with adjustment disorder with anxiety and indicated that she would be capable of handling her own financial affairs. (AR 504.)

9

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well-settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

I. **RFC Formulation**

A. **Accounting for cervical and lumbar spine problems**

Plaintiff faults the ALJ for failing to account fully for her cervical spine and lumbar spine problems, including hand limitations in her RFC.[3] As developed more clearly during

---

[3] In her brief, plaintiff represents that she had hand surgery in 2016 (Pl.'s Opening Br. (dkt. #9) 21-22), but does not note this surgery in her review of the medical records and does not cite to the administrative record in support of this representation. In the court's review of the medical record, it could not locate any evidence of hand surgery in 2016. As defendant points out in its opposition

10

the hearing, plaintiff contends that the ALJ erred in finding that (1) a light exertional work level was appropriate, and (2) she was capable of frequent, rather than occasional handling and fingering. As the Commissioner pointed out, however, plaintiff's work as an office manager is a sedentary position, calling into question whether the light exertion designation in her RFC is material. Still, as plaintiff responded, the officer manager job requires frequent handling and fingering, meaning that if the ALJ erred in finding that plaintiff was capable of frequent handling and fingering, then her prior job would no longer be an option. It is this interplay between the RFC findings that tips this close case and makes remand appropriate.

In particular, plaintiff argues that with respect to both RFC designations, the ALJ's reliance on the state agency physician's review of Prause's medical record in November 2014 and May 2015 is flawed in two main respects. *First*, plaintiff contends that neither physician addressed her cervical and lumbar spinal issues. Dr. Reynaldo Gotanco, M.D., conducted a review of the record on November 19, 2014, noted that she has arthritis and had suffered a fractured finger on her left hand in March 2013. (AR 102.) While Gotanco mentioned that "Claimant also has mild tenderness over the cervical spine due to spondylosis and degenerative disc disease" (*id.*), he did not mention the findings of the MRIs or x-rays from February and March 2014 or otherwise describe Dr. Zelby's surgery recommendation. Moreover, in his explanation of the RFC, Dr. Gotanco makes *no* mention of her cervical and lumbar spine issues. Dr. Vidya Madala, M.D.'s review on March 21,

---

brief, plaintiff had surgery on her right wrist in October 2014 (AR 361), but there is nothing to indicate that resulted in any long-term limitations.

2015, also contains no reference to Prause's cervical and lumbar spine issues, including any reference to the 2014 MRIs. (AR 117-19.)

While the ALJ only placed some weight on these two opinions, finding that "evidence received at the hearing level also supports additional limitations as outlined above" (AR 20), plaintiff rightly points out that without the benefit of the state agency's physician -- or any other doctor's opinion as to plaintiff's exertional limitations -- it is unclear how the ALJ reached her determinations as to whether Prause should be limited to light work or to frequent as compared to occasional operation, manipulation, fingering, reaching, etc. As the Commissioner points out, it is the ALJ's responsibility to determine the RFC (Def.'s Opp'n (dkt. #11) 13), but she must build a logical bridge between her findings and the evidence. Here, given the lack of any physician review of her cervical and lumbar spine issues, or opinion as to how they might impact her exertional functional abilities, the reasoning appears lacking. The court is sympathetic to the Commissioner's argument that in placing only some weight on the state agency physician's opinions, the ALJ actually credited Prause's account of her own limitations in part, but discounting the state agency physician's opinions does not relieve the ALJ of her obligation of explaining how her findings as to the exertional level of specific physical restrictions is tied to substantial evidence in the record, as opposed to the ALJ's impermissible rendering of her own medical opinions.

*Second*, plaintiff faults the ALJ for failing to obtain a medical review of the plaintiff's record *after* the March 2016 MRIs. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have

12

changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728-29 (7th Cir. 2018), *as amended on reh'g* (Apr. 3, 2018). This argument has far less traction from the outset, since plaintiff's March 2016 MRIs do not constitute "new" diagnoses even if they arguably show some changes in her condition. Nevertheless, in remanding, the ALJ has the discretion to seek a new record review, encompassing the March 2016 MRI results, should she so choose. At minimum, the court agrees with plaintiff that the ALJ lacks the medical expertise to assess whether any of the changes noted in the March 2016 MRI results would impact her limitations for purposes of crafting an appropriate RFC.[4] *See McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) ("We have said repeatedly that an ALJ may not 'play[] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny." (internal citation omitted)). Accordingly, on remand, the ALJ may continue to rely on the evidence suggesting that Prause's symptoms of cervical pain and hand pain or strength, were stable during the relevant period of time, whether based on her RA diagnosis or her cervical spine issues.

### B. Accounting for mental health limitations

In crafting an RFC, the ALJ appears to have accounted for Prause's moderate limitations in social functioning by limiting her to frequent interactions with supervisors and coworkers, but only occasional interactions with the public. Plaintiff argues that "the decision lacks any basis for finding that Prause's anxiety disorder was accommodated by"

---

[4] Plaintiff also argues that the difference between a frequent and occasional limitation on handling and fingering could preclude her from her past work (Pl.'s Opening Br. (dkt. #9) 22), though it is unclear whether this would also impact the ALJ's alternative finding that she could perform other work available in the national economy.

these limitations. (Pl.'s Opening Br. (dkt. #9) 35.)

Plaintiff correctly points out that the state agency psychologists concluded that plaintiff did not have a severe mental impairment. The ALJ, however, only placed some weight on this decision, relying on medical records and plaintiff's testimony to find that her anxiety was a severe impairment. Even so, Prause's treatment record was limited, and Dr. Stahnke assessed her global assessment of functional ("GAF") score as 65, which indicates on "mild symptoms" or "some difficulty" but "generally function pretty well. Nonetheless, plaintiff testified that she did not have trouble getting along with others, but was reluctant to attend social events because of concerns that she was a burden. (AR 267-68.) The ALJ reasonably relied on this testimony to limit her to frequent interactions with coworkers and supervisors but only occasional interactions with the public. The court sees no flaw in this conclusion, and plaintiff fails to explain what additional restrictions are required and how the record would support these additional restrictions.

Plaintiff also faults the ALJ for failing to take into consideration her mild limitations in CPP in formulating her RFC, specifically criticizing the ALJ for failing to account for this mild limitation in concluding that she could perform her past relevant work which, plaintiff contends, involved a higher level of skill. (*Id.*) at 21.) Both parties cite to cases that do *not* support their respective positions. Plaintiff cites to *Denton v. Astrue*, 596 F.3d 419 (7th Cir. 2010), representing that the Seventh Circuit "remand[ed] where the ALJ found claimant's depression a non-severe impairment, but failed to incorporate limitations in the RFC account for even non-severe impairments." (Pl.'s Opening Br. (dkt. #9) 35.) Not so. In *Denton*, the Seventh Circuit affirmed the denial of benefits, rejecting the

14

claimant's argument that the ALJ erred in failing to account for her depression in crafting the RFC. The Commissioner cites to *Davis v. Berryhill*, 723 F. App'x 351 (7th Cir. Jan. 11, 2018), representing that the court "affirm[ed] ALJ who found that mild mental limitations did not warrant any mental restrictions in the claimant's RFC." (Def.'s Opp'n (dkt. #11) 16.) While true that the Seventh Circuit affirmed the denial of benefits, the court simply upheld the conclusion that the claimant's depression was non-severe in light of the ALJ's finding that the claim only experienced mild limitations in the four functional areas; however, the court did *not* approve, or otherwise comment, on the ALJ's treatment of mild limitations (or lack thereof) in crafting an RFC. 723 F. App'x at 356.

While the Seventh Circuit has held that the ALJ is required to consider non-severe limitations in setting an RFC, *Terry v. Astrue*, 580 F.3d 471, 4744 (7th Cir. 2009), there is nothing to indicate that the ALJ failed to do so here. The ALJ determined whether and the extent of any limitations in the four functional areas, then further determined that a mental restriction in her RFC was warranted to reflect her moderate limitations in interacting with others. By not including any restrictions to reflect her mild, and, therefore, non-severe limitations, in CPP, the ALJ reasonably concluded that no restrictions were warranted. This finding makes sense in light of (1) the results of her mental status assessment with Dr. Stahnke, in which she performed well on memory and concentration tests (AR 502), and (2) her own assessment on a social security form indicating that she "most always" can pay attention, that she finishes activities and does well following both

15

written and spoken instructions (AR 268).[5]  As such, the court rejects this basis for remand.

## II. Credibility Assessment

Prause also challenges the ALJ's credibility determination.  The court reviews an ALJ's credibility findings deferentially, reversing only if it is "patently wrong."  *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017).  In evaluating the credibility of a claimant's statements regarding her symptoms in particular, the ALJ must initially determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 WL 1119029, at *3.  If so, the ALJ must then evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  *Id.*, 2016 WL 1119029, at *4.  If not substantiated by objective medical evidence, however, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record while considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment that the claimant has received for relief of pain or other symptoms.  *Id.*, 2016 WL 1119029, at *7.

As set forth above, the ALJ offered three reasons for discounting Prause's allegations of limitations:  (1) they were not supported by the objective medical evidence, specifically

---

[5] At the hearing, plaintiff argued that her mild CPP limitation should have resulted in a restriction to unskilled work, but in making this argument plaintiff falls into the same trap, which the Seventh Circuit has repeatedly criticized of accommodating a CPP limitation by limiting an individual to unskilled, routine work.  *See, e.g.*, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).  Regardless, plaintiff fails to explain why a limitation of unskilled, routine work would be required to address her anxiety.

pointing to "minimal clinical findings on examination regarding her hands," that her "rheumatoid arthritis has been routinely stable on medication," and that while the records reflected prior neck surgeries, her "symptoms were noted as controlled with the medications," and that she had yet to schedule another surgery; (2) there were inconsistencies in the record, namely she testified at the hearing that she could not afford physical therapy but she was attending it as the time of the hearing, that she indicated on a form that she was able to perform all her activities with mild difficulty and that she testified that she had balance problems, resulting in her falling and hurting her foot, but the records reflect that she was walking and struck the doorframe with her foot; and (3) there is "no medical opinion in the file opining that the claimant is unable to work or that provides limitations that would conclude such." (AR 19-20.)

In her brief, plaintiff primarily challenges the ALJ's apparent consideration that the objective medical evidence, namely the 2016 MRIs, would not support or are otherwise inconsistent with Prause's description of her symptoms. For the reasons described above, the court agrees that the ALJ's ability to understand and account for Prause's cervical and lumbar spinal issues is a sufficient basis for remanding for further review. As part of that review, the ALJ will have a fresh opportunity to better evaluate whether Prause's description of her symptoms and limitations are consistent with those records.

Plaintiff also faults the ALJ for failing to explore the noted inconsistencies in the record. (Pl.'s Opening Br. (dkt. #9) 41 (citing *Engstrang v. Colvin*, 788 F.3d 655, 661-62 (7th Cir. 2015)).) On remand, the court will have another opportunity to explore these inconsistencies as well.

ORDER

IT IS ORDERED that the decision of defendant Andrew M. Saul, Commissioner of Social Security, denying plaintiff Yvonne Marie Prause's application for disability and disability insurance benefits and supplemental security income is REVERSED AND REMANDED under sentence four of 42 U.S.C. 405(g) for further proceedings consistent with the opinion set forth above.

Entered this 12th day of February, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge